<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| DENNIS COPLING, | : | |
| | : | Civil Action No. 05-6010 (JBS) |
| Petitioner, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| RONALD CATHEL, et al., | : | |
| | : | |
| Respondents. | : | |

**APPEARANCES:**

> DENNIS COPLING, Petitioner *pro se*
> # 289645-106257C
> New Jersey State Prison
> 6-Left, P.O. Box 861
> Trenton, New Jersey 08625
>
> JASON MAGID, ESQ.
> CAMDEN COUNTY PROSECUTOR'S OFFICE
> 25 North Fifth Street
> Camden, New Jersey 08102
> Counsel for Respondents

**SIMANDLE**, Chief Judge

Petitioner Dennis Copling ("Petitioner"), a convicted state prisoner presently confined at the New Jersey State Prison in Trenton, New Jersey, has submitted a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his New Jersey state court judgment of conviction entered on or about March 25, 1997. For the reasons stated herein, the Petition will be denied for lack of substantive merit.

I.  BACKGROUND

A.  Procedural History

On or about October 5, 1995, a Camden County Grand Jury indicted Petitioner on five counts as follows: (Count One) first degree conspiracy to commit murder, in violation of N.J.S.A. 2C:5-2; (Counts Two and Three) first degree murder, in violation of N.J.S.A. 2C:11-3a; (Count Four) possession of a weapon for an unlawful purpose, in violation of N.J.S.A. 2C:39-4b; and (Count Five) unlawful possession of a handgun, in violation of N.J.S.A. 2C:39-5b.  (Ra1, Camden County Indictment No. I-2469-10-95.).[1]

A trial was held before a jury and the Honorable Linda Rosensweig, J.S.C., in January 1997.  On February 5, 1997, the jury returned a verdict of guilty on Counts One, Three, Four and Five, and on the lesser included charge of aggravated manslaughter under Count Two.  Judge Rosensweig sentenced Petitioner on March 25, 1997, to a term of life imprisonment with a thirty (30) year parole disqualifier on the murder count (Count Three), and merged Count One and Count Four into Count Three.  On Count Two (aggravated manslaughter), Petitioner was sentenced to a thirty year prison term with a fifteen year parole disqualifier to be served concurrently to the sentence

_____

[1] The State provided the relevant state court record with a list of exhibits, hereinafter denoted as "Ra".  See Docket entry no. 14-1).

2

imposed under Count Three.  On Count Five, Petitioner was sentenced to a prison term of five years with a two and a half year term of parole ineligibility to be served consecutively to Count Three.  In sum, Petitioner was sentenced to an aggregate prison term of life plus five years with a thirty-two year parole disqualifier.  A judgment of conviction was entered on or about March 25, 1997.  (Ra3.)

Petitioner filed a notice of appeal from his conviction and sentence to the Superior Court of New Jersey, Appellate Division.  (Ra4.)  In a published opinion entered on December 16, 1999, the Appellate Division affirmed the conviction and sentence, except the consecutive sentence imposed on Count Five, which was reversed and remanded for re-sentencing consistent with the Appellate Division's opinion.  (Ra7.)  *State v. Copling*, 326 N.J. Super. 417 (App. Div. 1999).  An amended judgment of conviction was entered accordingly on January 28, 2000, in which the sentence on Count Five was imposed to be served concurrently with the sentence on Count Three.  (Ra8.)  The Supreme Court of New Jersey denied certification on April 4, 2000 (filed on April 6, 2000).  (Ra12.)

On or about December 8, 2000, Petitioner filed his first state petition for post-conviction relief ("PCR").  (Ra13.)  Oral argument was heard on the first PCR petition on August 26,

2002, at which time an Order denying the PCR petition was entered.  (Rta10).[2]  Petitioner appealed from denial of his first state PCR petition, and the Appellate Division affirmed in an unpublished opinion decided May 23, 2005.  (Ra22).  The Supreme Court of New Jersey denied certification on September 12, 2005.  (Ra26).

On July 11, 2006, Petitioner filed his second PCR petition, which was denied by Order dated June 11, 2007, as time-barred pursuant to New Jersey Court Rule 3:22-12.  (Ra27).  On March 17, 2009, Petitioner filed a motion for leave to appeal *nunc pro tunc.*  (Ra28).  The Appellate Division denied Petitioner's motion and dismissed the appeal without prejudice in an Order filed on May 8, 2009.  (Ra29).  Petitioner then filed a motion to reinstate his appeal and file his appeal *nunc pro tunc*, which was denied by the Appellate Division in an Order filed on July 7, 2009.  (Ra30, Ra31).

On or before December 27, 2005, Petitioner filed a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, before this Court.  In an Order entered on January 5, 2006, this Court granted Petitioner's application to proceed in forma pauperis, advised Petitioner of his rights under *Mason v.*

---

[2] "Rta" refers to the transcripts of the relevant state court proceedings provided by the State and listed in Docket entry no. 14-1.

*Meyers*, 208 F.3d 414 (3d Cir. 2000).  (Docket entry no. 3).  On February 28, 2006, this Court entered an Order dismissing this petition without prejudice to Petitioner filing one all-inclusive habeas petition, as requested in his February 3, 2006 letter response to the Court's Mason Order.  (Docket entry no. 4).

On or about June 8, 2011, Petitioner filed a motion to re-open his habeas action.  (Docket entry no. 5).  This Court granted Petitioner's motion in an Order entered on December 22, 2011.  The Order denied Petitioner's request to add unexhausted claims and his application for appointment of counsel.  The Order also directed Respondents to file an answer to Petitioner's habeas petition.  (Docket entry no. 6).

Respondents answered the petition on April 12, 2012, providing the relevant state court record.  (Docket entry nos. 14, 15).  Respondents also filed a motion to seal Exhibit Ra-PSR (Petitioner's presentence report).  (Docket entry no. 16).  The Court granted Respondents' motion to seal in an Opinion and Order entered on December 19, 2012.  (Docket entry nos. 19 and 20).  Petitioner filed a traverse/reply to Respondents' answer on or about May 4, 2012.  (Docket entry no. 18).

B.  <u>Factual Background</u>

The facts of this case were recounted below and this Court, affording the state court's factual determinations the appropriate deference, see 28 U.S.C. § 2254(e)(1), will simply reproduce the recitation as set forth in the published opinion of the Superior Court of New Jersey, Appellate Division, decided on December 16, 1999, with respect to Petitioner's direct appeal:

> Lakesha Buckhannon (hereinafter "Lakesha") lived with her mother in Camden.  Lakesha's older half-brother, Kirby Bunch (known as and hereafter referred to as "K.C."), lived nearby.  Lakesha received a puppy as a Christmas present in 1994, and her friend, Gary Copling (hereinafter "Gary"), defendant's younger brother, offered to help walk and train the puppy.

> On January 17, 1995, Gary took the dog to his home, but when Lakesha stopped at the Copling residence to retrieve the dog, Gary said he did not have it.  Lakesha was upset and believed Gary was lying to her, so she called her brother K.C.  Lakesha told K.C. what had happened with the dog then she, K.C., their cousin, Latisha Fair (hereinafter "Latisha"), and K.C.'s friend, Nate Simmons (hereinafter "Nate"), drove around the neighborhood looking for Gary. When they found him at a friend's house, K.C. hit Gary with a bottle and then began to punch, kick, and choke him. Eventually, Nate pulled K.C. off of Gary, and Gary fled.

> The next day, Lakesha, her mother, and Latisha were at the home of a friend when defendant, Gary's older brother, arrived.  Defendant had learned that K.C. had beaten Gary the previous evening.  Defendant demanded to know K.C.'s whereabouts.  Defendant kept repeating that he was going to "get" K.C.  Defendant also stated that he was going to find K.C. and kill him.  Because defendant was visibly upset, Lakesha's mother called the police.  The police arrived, but did not take any action.  Thus, Lakesha and Latisha

6

left their friend's house to find K.C. and warn him about defendant.

That evening, K.C. was at Nate's apartment.  A mutual friend, Benjamin Young (hereinafter "Ben"), was also visiting.  According to the testimony of Nate and Ben, Malik arrived at the apartment upset and angry, wanting to know why the three men had jumped Gary the previous night.  Nate told Malik that the three had not jumped or beaten Gary.  Malik then said they "well, you're going to speak with [Gary's] brother."  K.C. and Malik then walked into the kitchen together.

Nate testified that he was sitting in the living room when K.C. and Malik entered the kitchen.  Nate saw another man enter the kitchen through the back door of the apartment.  The man was wearing a foam rubber half-mask over the lower half of his face.  Nate described the man as about 6'2", well built, and wearing a black and white jacket, a black hooded sweatshirt with the hood pulled up, a black sweater, and dark green pants.  Nate testified that the man said, "Why you jump my brother?" and pulled a black automatic handgun from his jacket pocket.  K.C. was standing in front of Malik and grabbed for the gun.  Both Nate and Ben heard a gunshot and started to run.  As they fled, they heard between three and five more gunshots.  Nate further testified that the man in the mask matched the height and build of defendant.

Timothy Queensberry, a neighbor, testified that he was at home that same evening and heard gunshots and a voice shouting that he recognized as K.C.'s.  After hearing the commotion, Queensberry walked outside and saw K.C. lying on the ground, calling for help.  Queensberry could tell that K.C. had been shot and asked who had shot him, to which K.C. replied, "Dennis," obviously referring to defendant.  As Queensberry was aiding K.C., a car stopped momentarily across the street and then drove away.  Then a man, described as about 5'6" tall and "kind of built", ran to Queensberry and K.C., pulled a black 9-millimeter handgun from his waist, and shot K.C. once in the neck.  The man fled, firing shots behind him, but failing to hit anyone.  Queensberry testified that the man he saw shoot K.C. in the head was not defendant, whom Queensberry knew.

7

The police arrived and found K.C. dead on the ground outside the apartment.  The police found Malik in the kitchen, still alive but suffering from gunshot wounds.  A loaded 9-millimeter handgun, containing seven rounds of live ammunition with one round still in the chamber, was found on the floor in the kitchen. The emergency medical personnel transported both victims to the hospital where K.C. was pronounced dead, and Malik subsequently died.

The autopsy indicated that K.C. had been shot three times: in the back of the neck, the middle of his back, and his lower left side.  The gunshot to the neck had been fired from a distance greater than eighteen inches.  The other two gunshots to his torso were "contact" wounds, resulting from the gun being placed directly on his body.  Neither the shot to his neck nor to his lower left side would have been independently fatal; however, the shot to his back alone would have been likely to cause death.  The reported cause of death was the combined effect of three gunshot wounds.

The autopsy performed on Malik revealed that he had been shot twice, in his back and thumb.  The wound to his back was fired from a distance and caused his death.

One bullet was recovered from each victim's body.  Two spent 9-millimeter shell casings were found at the scene, one on the kitchen floor and one outside the apartment.  A third 9-millimeter shell casing was found by a neighbor and turned over to the police.  The State Police laboratory determined that all three shells were fired from the same weapon, but that none of the shells could have been fired from the gun found at the scene on the kitchen floor.

On January 27, 1995, the police arrested defendant for killing K.C. and Malik.  Defendant was provided with *Miranda*[3] warnings.  At first, defendant maintained that he was unaware of the deaths of the two victims.  However, later in the interview with the police at the prosecutor's office, defendant admitted that he had gone with Malik and Donne Parker, known as "Fahim" on the evening of January 18, 1995, to find K.C. at Nate's apartment and fight with him.  Fahim waited in the car while Malik and defendant

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

walked up to the apartment.  Defendant waited outside while
Malik entered the apartment.  Defendant had instructions
from Malik to fetch Fahim if any problems developed.
Inside the apartment, Malik and K.C. began to exchange
heated words, so defendant ran back to the car to summon
Fahim.  Defendant stated that he fled from the apartment,
but Fahim entered the apartment and shot at K.C.  According
to defendant's oral statement, as he was running, he heard
shots, looked behind him, and saw K.C. lying on the ground
with Fahim standing over him and shooting at him.  The oral
interview was interrupted when defendant's family arrived
at the prosecutor's office.  A formal written statement was
never prepared.

At trial, Leervin Hill testified that on the evening of the
crime, he saw defendant pacing and cursing on the street.
Defendant approached Hill, took a black foam rubber half-
mask from around Hill's neck, and walked away with the
mask.  Both Lakesha and Latisha testified that they had
seen defendant with a handgun prior to the killings.

At trial, the State contended that defendant fired two
shots at K.C. in the kitchen and that Fahim, acting as an
accomplice and using the same gun, returned and shot K.C.
once in the neck outside the apartment.  The State further
contended that the doctrine of transferred intent holds
defendant culpable for murdering Malik because the shot
that killed Malik was intended to kill K.C.

(Ra7, December 16, 1999 Appellate Division Opinion, *State v.
Copling*, Docket No. A-2058-97T4 slip op. at 2-7).

## II.  <u>STATEMENT OF CLAIMS</u>

Petitioner asserts the following claims in his petition for
habeas relief:

**Point One**:  The state court's ruling Petitioner's state and
federal constitutional rights to due process and a fair trial

were not violated by the State's withholding of exculpatory information was contrary to clearly established Federal law.

**Point Two**:  The state court's ruling that the Petitioner was not denied his Sixth Amendment right to effective assistance of counsel for failing to investigate, interview and call eyewitnesses who exculpated Petitioner was contrary to clearly established Federal law.

**Point Three**:  The state court's ruling that failure of the trial court to provide the jury with an instruction on identification was not error was contrary to clearly established Federal law.

**Point Four**:  The state court's ruling that the failure of the trial court to provide the jury with a jury instruction on passion/provocation was not plain error was contrary to clearly established Federal law.

**Point Five**:  The state court's ruling that the failure of the trial court to grant Petitioner's request for an adjournment and for the removal of his trial attorney because of a conflict of interest did not deprive Petitioner of a fair trial was contrary to clearly established Federal law.

**Point Six**:  The state court's ruling that the prosecutor's elicitation of testimony about a prior incident involving

Petitioner's possession of a gun did not deprive Petitioner of a fair trial was contrary to clearly established Federal law.

**Point Seven**:  The state court's ruling that the Petitioner's maximum term of life on the murder count and a consecutive sentence for a first time offender was not error was contrary to Federal law

The State essentially contends that the petition is without merit, or fails to raise a claim of federal constitutional dimension that would entitle Petitioner to habeas relief.  The State also asserts that Petitioner failed to exhaust his state court remedies as to Points Three through Seven in the petition, but despite this failure to exhaust, Petitioner fails to raise even a colorable federal claim as to these unexhausted grounds such that they are subject to dismissal on the merits pursuant to 28 U.S.C. § 2254(B)(2).

III.  STANDARD OF REVIEW

A pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers.  *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Haines v. Kerner*, 404 U.S. 519, 520 (1972).  A pro se habeas petition and any supporting submissions must be construed liberally and with a measure of tolerance. *See Royce v. Hahn*, 151 F.3d 116, 118 (3d Cir. 1998); *Lewis v. Attorney General*, 878 F.2d 714, 721-22 (3d Cir. 1989).  Thus,

11

because Petitioner is proceeding as a *pro se* litigant in this matter, the Court will accord his habeas petition the liberal construction intended for *pro se* petitioners.

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254, this Court has jurisdiction to entertain a petition for federal habeas relief as follows:

> [A] district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a).

Section 2254(d) of the federal habeas corpus statute provides the standard of review for federal court review of state court criminal determinations and provides, in relevant part, as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.

28 U.S.C. § 2254(d); *see also Parker v. Matthews*, 132 S.Ct. 2148, 2151 (2012).

"Clearly established Federal law" should be determined as of the date of the relevant state court decision and is limited to the record that was before the state court that adjudicated the claim on the merits. *Greene v. Fisher*, ---U.S. ----, 132 S.Ct. 38, 181 L.Ed.2d 336 (2011); *Cullen v. Pinholster*, 563 U.S. ----, 131 S.Ct. 1388, 1398, 179 L.Ed.2d 557 (2011). A state-court decision is "contrary to" clearly established federal law if the state court (1) contradicts the governing law set forth in Supreme Court cases or (2) confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000); *Jamison v. Klem*, 544 F.3d 266, 274 (3d Cir. 2008). The state court judgment must contradict clearly established decisions of the Supreme Court, not merely law articulated by any federal court, *Williams*, 529 U.S. at 405, although district and appellate federal court decisions evaluating Supreme Court precedent may amplify such precedent, *Hardcastle v. Horn,* 368 F.3d 246, 256 n. 3 (3d Cir. 2004)(citing *Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 890 (3d Cir. 1999)). "[C]ircuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme

13

Court,' [and] therefore cannot form the basis for habeas relief under AEDPA." *Parker*, 132 S.Ct. at 2155.  The state court is not required to cite or even have an awareness of governing Supreme Court precedent "so long as neither the reasoning nor the result of [its] decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002); *Jamison*, 544 F.3d at 274-75.  Few state court decisions will be "contrary to" Supreme Court precedent.

The federal habeas court more often must determine whether the state court adjudication was an "unreasonable application" of Supreme Court precedent.  A state-court decision 'involves an unreasonable application' of clearly established federal law if the state court (1) identifies the correct governing legal rule from the Supreme Court's cases but unreasonably applies it to the facts of the particular case; or (2) unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.  *Williams*, 529 U.S. at 407.  A showing of clear error is not sufficient. *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003).  Nor is habeas relief available merely because the state court applied federal law erroneously or incorrectly.  *See Harrington v. Richter*, 562 U.S. ----, ----, 131 S.Ct. 770, 785, 178 L.Ed.2d 624 (2011)

14

(Under § 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." (quoting *Williams* at 410)); *see also Thomas v. Varner*, 428 F.3d 491, 497 (3d Cir. 2005); *Jacobs v. Horn*, 395 F.3d 92, 100 (3d Cir. 2005). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 131 S.Ct. at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington*, 131 S.Ct. at 786–87.

The Supreme Court repeatedly has reiterated the deference that the federal courts must accord to state court decisions. *See Felkner v. Jackson*, ---U.S. ----, 131 S.Ct. 1305, 1307, 179 L.Ed.2d 374 (2011)("AEDPA imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt."); *Cullen v. Pinholster*, 131 S.Ct. at 1398; *Eley v. Erickson*, __ F.3d __, 2013 WL 1405923, *4 (3d Cir. April 9, 2013). *See also*

15

*Harrington*, 131 S.Ct. at 786 ("We must use habeas corpus as a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal."); *Renico v. Lett*, 559 U.S. 766, 130 S.Ct. 1855, 1862, 176 L.Ed.2d 678 (2010)("whether the trial judge was right or wrong is not the pertinent question under AEDPA"); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable -- a substantially higher threshold."); *Lockyer*, 538 U.S. at 75 ("it is not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was erroneous."). Further, AEDPA's standard applies even where "the state court analyzed and rejected a habeas petitioner's federal claims on the merits but gave 'no indication of how it reached its decision.'" *Grant v. Lockett*, 709 F.3d 224, 230 (3d Cir. 2013)(quoting *Han Tak Lee v. Glunt*, 667 F.3d 397, 403 (3d Cir. 2012)).

A state court decision is based on "an unreasonable determination of the facts" only if the state court's factual findings are "'objectively unreasonable in light of the evidence presented in the state-court proceeding.'" *Miller-El v.*

16

*Cockrell*, 537 U.S. 322, 340 (2003)(citing, *inter alia*, 28 U.S.C. § 2254(d)(2)).  Moreover, a federal court must accord a presumption of correctness to a state court's factual findings, which a petitioner can rebut only by clear and convincing evidence.  28 U.S.C. § 2254(e); see also *Rice v. Collins*, 546 U.S. 333, 339 (2006) (petitioner bears the burden of "rebutting the presumption by 'clear and convincing evidence.'" (quoting 28 U.S.C. § 2254(e)(1)); *Duncan v. Morton*, 256 F.3d 189, 196 (3d Cir. 2001)(factual determinations of state trial and appellate courts are presumed to be correct).  Where a state court's factual findings are not made explicit, a federal court's "duty is to begin with the [state] court's legal conclusion and reason backward to the factual premises that, as a matter of reason and logic, must have undergirded it."  *Campbell v. Vaughn*, 209 F.3d 280, 289 (3d Cir. 2000).  In determining what implicit factual findings a state court made in reaching a conclusion, a federal court must infer that the state court applied federal law correctly.  *Id*. (citing *Marshall v. Lonberger*, 459 U.S. 422, 433 (1982)).

Even if the petitioner is entitled to habeas relief under AEDPA, the court may grant the writ only if the error was not harmless.  Under the harmless error standard, the court must "assess the prejudicial impact of [the] constitutional error in

17

[the] state-court criminal trial." *Fry v. Pliler*, 551 U.S. 112, 121 (2007).  The court should hold the error harmless unless it led to "actual prejudice," in the form of a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)(quotation omitted); *Eley v. Erickson*, __ F.3d __, 2013 WL 1405923 (3d Cir. April 9, 2013).

IV.  DISCUSSION

A.  Brady[4] Violation

In his first claim, Petitioner alleges that he had learned from his state PCR attorney during his PCR proceedings that a witness, Barbara Buckhannon had related information to Detective Forte of the Camden County Prosecutor's Office about a witness to the crime, named Quetta Smith.  Ms. Smith allegedly was present at the scene of the crime during the shooting and had observed several perpetrators but Petitioner was not one of them.  This potentially exculpatory information about witness Quetta Smith was never provided by the State to Petitioner, and such information could have been used to corroborate the testimony of witness Timothy Queensberry, who testified that the man he saw shoot the victim was not Petitioner.  (Petition, Point One.)

---

[4] *Brady v. Maryland*, 373 U.S. 83 (1963).

18

Petitioner raised this claim in his state PCR proceedings. At the PCR hearing on August 26, 2002, the PCR judge noted that, in the certification submitted by Barabara Buckhannon, Buckhannon stated that she had been interviewed and questioned by Detective Forte about six times between the day after the murder and the time of trial.  The PCR court then read verbatim Buckhannon's statement into the record:

> During these interviews I advised Detective Forte that I no longer believed Dennis Copling shot my stepson, Kirby Bunch.  My trial testimony was tendered truthfully to the effect that Dennis Copling had made terroristic threats towards my daughter and I.
>
> At the time of my trial testimony for the prosecution I was of the belief that Dennis Copling was not the individual who shot my stepson, Kirby Bunch.  The primary reason for my belief that Dennis Copling was not the individual who shot my stepson are statements made to me by my cousin, Quetta Smith.  Quetta Smith told me within a week of the murder of Kirby Bunch before his funeral services commenced that she was an eyewitness present at the scene of the crime during the time and place of the shooting, that she observed several perpetrators of the crime and Dennis Copling, whom she knew very well, was not one of them."

(Rta10, PCRT 20:17-21:13.)

In rejecting Petitioner's claim of a *Brady* violation, the PCR court ruled:

> Based upon that, it is unclear whether she's talking about the conspiracy to commit the murder of Kirby Bunch outside of the apartment or the murder that this defendant was convicted of committing by his own conduct, which was the murder of [Malik] Winston, inside of the apartment.

19

But, under *Brady*, the first element that the defense has to establish is that the testimony would have been favorable to the defense.  And I find from the showing that has been made today, that the defense has not satisfied the threshold showing that would be required in order to have a hearing.

That is because there is not enough from Barbara Buckhannon to establish that the purported witness, Quetta Smith (phonetic), would have been able to see anything that was favorable because if she was a witness to what occurred outside of the apartment, the defendant is alleged only to be a conspirator.  That's what he was convicted of.

But, the conspiracy is not one that would have been formed outside of the apartment.  It would have been formed inside.  And therefore, her presence outside the apartment would not be – or, her ability to observe something that occurred outside the apartment would not bear upon the conspiracy charge.

Certainly, if she was standing outside, it would not bear upon what went on inside, which was the murder of [Malik] Winston for which Dennis Copling was convicted.

The defense has presented the affidavit or verification of – not verification, the affidavit or certification of Barbara Buckhannon.  The defense spoke to her and could have presented an affidavit which is more detailed and could have related better what it was that Quetta Smith (phonetic) says.

Therefore, I find that the affidavit or certification presented by Miss Buckhannon is highly ambiguous as to whether Quetta Smith (phonetic) saw anything that would have been favorable or exculpatory.

And therefore, I find that that prong of the *Brady* Test has not been established.

It is also the responsibility of the defense to show that the State was aware of the exculpatory material and suppressed it.  And although Barbara Buckhannon says that Detective Forte interviewed her approximately six times and she goes on to say that during these interviews she advised

20

Detective Forte that she no longer believed that Dennis
Copling shot her stepson, Kirby Bunch, what she did not say
in this verification (sic.) is that she mentioned Quetta
Smith's (phonetic) name to Detective Forte.

She simply says that she herself was aware of what Quetta
Smith (phonetic) had told her, that she spoke to Detective
Forte, but she does not say in this affidavit that during
her interviews with Detective Forte she ever mentioned
Quetta Smith's (phonetic) name.

It is the burden of the defense when alleging a *Brady*
violation to come forward with competent proof and I find
that the affidavit that has been submitted does not
establish that Barbara Buckhannon told Detective Forte of
the existence of Quetta Smith (phonetic).

I therefore find that the second prong has not been
established, which is the prong requiring the defense to
show that the State suppressed the evidence.

Because I find that the first two have not been
established, there is really not a need to review the issue
of materiality.  But, I think it's fair to say that if she
had information only pertaining to what went on outside of
the apartment, then it wouldn't have been material in any
event for the reasons I've already explained when
discussing the elements of whether the testimony would be
favorable or not and there is really no need to repeat it.

Therefore, I find that the defense has today failed to
establish the elements required under *Brady* to establish a
denial of due process.

(Rta10, PCRT 21:15-24:20.)

The Appellate Division affirmed the decision by the PCR

court on appeal from denial of the PCR petition.  The Appellate

Division first addressed the facts pertinent to its decision on

the *Brady* claim:

21

There were a total of five <u>males</u> inside the apartment where
Bunch and Winston were shot by defendant, namely, the two
victims, defendant, and two friends of Bunch.  After being
shot three times by defendant, Bunch was able to exit the
building where he was found lying on the ground by a
neighbor.  While receiving aid from the neighbor, Bunch was
shot in the neck by a second shooter.

(Ra22, March 23, 2005 Appellate Division Opinion, pg. 3.)

Finding the PCR court's ruling on this issue to be

"thorough and well-reasoned," the Appellate Division reiterated:

Here, it is clear from the trial record that no women were
present inside the apartment when defendant shot Bunch and
Winston.  Thus, assuming the veracity of Buckhannon's
hearsay statement as to what she was told by Mrs. Smith
and, assuming the State was aware of this information prior
to trial (two major assumptions), any observations made by
Smith would be limited to the shot fired on the street.
Since the State never contended that defendant fired any
shots outside of the apartment, the value of Smith's
observations is, at best, dubious as to defendant's guilt.
In these circumstances, we do not discern a *Brady* violation
or a need for an evidentiary hearing.

(Ra22, May 23, 2005 Appellate Division Opinion, pp. 7-8.)

"[T]he suppression by the prosecution of evidence favorable

to an accused ... violates due process where the evidence is

material either to guilt or to punishment."  *Brady v. Maryland*,

373 U.S. 83, 87 (1963).  This rule requires prosecutors to

disclose known material information favorable to the accused and

"to learn of any favorable evidence known to the others acting

on the government's behalf in the case, including the police."

*Kyles v. Whitley*, 514 U.S. 419, 437 (1995).  Thus, *Brady*

expressly proscribes withholding evidence "favorable to an accused" and "material to [his] guilt or to punishment." *Cone v. Bell*, 556 U.S. 449, 451 (2009).  To establish that a *Brady* violation undermines a conviction, a convicted defendant must make each of three showings: (1) the evidence at issue is "favorable to the accused, either because it is exculpatory, or because it is impeaching"; (2) the State suppressed the evidence, "either willfully or inadvertently"; and (3) "prejudice ... ensued." *Strickler v. Greene*, 527 U.S. 263, 281–282 (1999); *see Banks v. Dretke*, 540 U.S. 668, 691 (2004). "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985).  Thus, nondisclosure merits relief only if the prosecution's failure "'undermines confidence in the outcome of the trial.'" *Kyles v. Whitly*, 514 U.S. 419, 434 (1995) (quoting *Bagley*, 473 U.S. at 678).

In this case, this Court agrees with the state courts' determination that the potential information from the alleged witness Quetta Smith was not material and would not have cast a different light sufficient to undermine confidence in the

23

verdict, which is necessary to sustain a *Brady* violation.  The
information provided by Ms. Buckhannon regarding Quetta Smith
dealt with the events that had occurred outside the apartment,
and the State had never argued that Petitioner was the person
who had shot the victim outside the apartment.  Moreover, the
State had presented substantial evidence at trial to show that
Petitioner was the shooter inside the apartment, where only five
males had been present, as noted by the Appellate Division,
namely, the Petitioner, the two victims and two friends of the
victim, Bunch (or K.C.).  Several witnesses had testified at
trial regarding Petitioner's participation in the shooting
inside the apartment.  Further, the victim identified "Dennis"
as the person who shot him inside the apartment.  Petitioner
also implicated himself in the plot to kill K.C. in a statement
he gave to police.  Thus, any argument that Quetta Smith would
have provided "exculpatory" testimony had Petitioner and his
counsel been made aware of her,[5] is completely meritless and of
inconsequential value.  Therefore, this Court finds that, in
light of this substantial evidence against Petitioner, there is

---

[5] This Court notes, as did the PCR court and Appellate Division,
that it was a "major assumption" to suppose that Ms. Buckhannon
made the State aware of Quetta Smith and that the State had this
information regarding Quetta Smith before trial, which is the
second factor under *Brady*, that the State either willfully or
inadvertently suppressed evidence.

no basis to conclude that the result of his trial would have
been different if information concerning the alleged witness
Quetta Smith had been produced to Petitioner and used at trial.
Accordingly, this Court finds that the decision of the state
courts regarding an alleged *Brady* violation was neither contrary
to, nor an unreasonable application of, clearly established
federal law, nor was the state court decision based upon an
unreasonable determination of the facts in light of the evidence
presented to it.  Petitioner is not entitled to relief on this
first claim.

B.  Ineffective Assistance of Counsel

   Petitioner next alleges that he was denied his Sixth
Amendment right to effective assistance of counsel because his
trial counsel failed to adequately investigate, interview and
call eye witnesses who would exculpate Petitioner.  In
particular, Petitioner alleges that trial counsel met with him
only once before trial.  At that conference with counsel,
Petitioner related that he wished to actively participate in his
defense, and requested copies of discovery and other documents,
which were never provided to Petitioner.  Petitioner also asked
that counsel interview a number of State witnesses.  One of
these witnesses was Barbara Buckhannon, who allegedly had
provided the name of an eye witness, Quetta Smith, which

25

Petitioner did not discover until his PCR proceedings. Petitioner alleges that, on January 21, 1997, he informed the trial court about this lack of communication with counsel, but the trial judge failed to address his concerns.  Petitioner states that the only defense tendered by counsel at trial was that Petitioner "was not the one who committed the crimes and could not be identified as the perpetrator."  (Petition, Point Two, Supporting Facts.)

The Court first will discuss the clearly established federal standard as set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  In *Strickland*, the Supreme Court "has recognized that the right to counsel is the right to the effective assistance of counsel.  Government violates the right to effective assistance when it interferes in certain ways with the ability of counsel to make independent decisions about how to conduct the defense.  Counsel, however, can also deprive a defendant of the right to effective assistance, simply by failing to render adequate legal assistance." *Strickland*, 466 U.S. at 685-86 (internal quotation marks and citations omitted)(citing and quoting *McMann v. Richardson*, 397 U.S. 759, 771 n. 14 (1970), and *Cuyler v. Sullivan*, 446 U.S. 335, 344-50 (1980)).  "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined

26

the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686; *Ross v. Varano*, __ F.3d __, 2013 WL 1363525, *9 (3d Cir. April 5, 2013).

To prevail on an ineffective assistance of counsel claim, a petitioner must demonstrate (1) that his counsel's performance fell below an objective standard of reasonableness, **and** (2) that but for counsel's errors the result of the underlying proceeding would have been different.  *Strickland*, 466 U.S. at 687-88. "Since *Strickland*, the Supreme Court and the Third Circuit have emphasized the necessity of assessing an ineffectiveness claim in light of all the circumstances."  *Grant v. Lockett*, 709 F.3d 224, 232 (3d Cir. 2013); *Siehl v. Grace*, 561 F.3d 189, 195 (3d Cir. 2009)(citing cases).

When a federal habeas petition under § 2254 is based upon an ineffective assistance of counsel claim, "[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable," which "is different from asking whether defense counsel's performance fell below Strickland's standard."  *Grant*, 709 F.3d at 232 (quoting *Harrington*, 131 S.Ct. at 785).  For purposes of § 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law."  *Id*. (internal quotation

27

marks omitted)(emphases in original).  "A state court must be
granted a deference and latitude that are not in operation when
the case involves [direct] review under the *Strickland* standard
itself."  *Id.*  Federal habeas review of ineffective assistance
of counsel claims is thus "doubly deferential."  *Id.* (quoting
*Cullen v. Pinholster*, 131 S.Ct. at 1403).  Federal habeas courts
must "take a highly deferential look at counsel's performance"
under Strickland, "through the deferential lens of § 2254(d)."
*Id.* (internal quotation marks and citations omitted).

   Petitioner raised his ineffective assistance of counsel
claim in his state PCR proceedings.  The PCR court rejected
Petitioner's claims.  On appeal from denial of the PCR petition,
the Appellate Division affirmed the PCR court's decision.
Applying the standard set forth in *Strickland*, and in *State v.
Fritz*, 105 N.J. 42 (1987), the Appellate Division stated:  "...
we are satisfied that defendant has not established a *prima
facie* case of trial counsel ineffectiveness.  Our review of the
record does not indicate that trial counsel's performance was
deficient.  As we noted on direct appeal, 'the evidence as a
whole created strong inferences', albeit "circumstantial", that
defendant was the shooter inside the apartment."  (Ra22, May 23,
2005 Appellate Division Opinion at pg. 8.)

28

Having carefully reviewed the record, and considering the claims asserted by Petitioner herein, this Court does not find that counsel was deficient in his investigation of this case and preparation of a defense.  The primary allegation of deficient performance relates to the Ms. Buckhannon's statement concerning a possible eyewitness, Quetta Smith, who may have had potentially exculpatory information.  This issue was addressed by this Court above, and rejected.  Thus, even if the Court allows that counsel may have been lax in discovering Quetta Smith, there was no resulting prejudice that would have changed the outcome of this case.  As noted by the Appellate Division, Ms. Smith would only have testified as to the shooter outside of the apartment, which the State never contended was the Petitioner.  (Ra22, pg. 22.)  Moreover, on direct appeal, the Appellate Division observed that "given the strength and sources of the circumstantial evidence, the issue of identification was not a key issue."  (Ra7, pg. 17.)

Further, Petitioner has not provided any factual basis or even conjecture as to what further investigation was necessary and what it would have proven for his defense.  "[C]ounsel has a duty to make [only] reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  *Strickland*, 466 U.S. at 691.  *See also Kimmelman*

29

*v. Morrison*, 477 U.S. 365, 384 (1986); *accord Lewis v. Mazurkiewicz*, 915 F.2d 106 (3d Cir. 1990)(expressly adopting *Strickland* and *Kimmelman* rationale for the purposes of failure-to-investigate analysis); *Echols v. Ricci*, 2011 WL 3678821 (D.N.J. Aug. 19, 2011), aff'd, 2012 U.S. App. LEXIS 14803 (3d Cir. July 19, 2012).  At best, Petitioner simply argues that he did not meet with counsel enough times before trial.

Therefore, there is no demonstration of deficient performance by counsel on any asserted claims, whether it concerns a potentially exculpatory witness Smith, or lack of jury charges on identification and lesser included offenses, that would have had any effect of undermining the verdict. Petitioner has not shown by any competent evidence that his counsel did not conduct a proper investigation in defense of Petitioner.  Therefore, based on all of the above, this Court concludes that the determination of the state PCR court and appellate court in finding no constitutionally ineffective counsel, resulted in a decision that was neither contrary to, nor involved an unreasonable application of, clearly established federal law under *Strickland*, nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See Williams*, 529 U.S. at 413.  The Court will deny federal

30

habeas relief on this ineffective assistance of counsel claim
because it is substantively meritless.

C.   Jury Instruction Claims

In Points Three and Four of his petition, Petitioner
asserts that the trial court erred in failing to provide the
jury with an instruction on identification, and that the trial
court failed to instruct the jury on the lesser included offense
of passion/provocation manslaughter.

1.   *Identification Instruction*

In his first claim concerning omitted jury instructions,
Petitioner contends that "because the sole defense presented at
trial was that because petitioner was not the person who had
shot and killed the victims, that the trial court's failure to
instruct the jury of the State's burden to prove the
petitioner's identity as the perpetrator beyond a reasonable
doubt, was error."  (Petition, Point Three, Supporting Facts.)
Petitioner raised this claim on direct appeal.  The Appellate
Division ruled as follows:

> A specific instruction regarding identification is required
> when that issue is essential to a case.  *See State v.
> Green*, 86 N.J. 281, 290 (1981).  To support his contention,
> defendant cites *State v. Frey*, 194 N.J. Super. 326 (App.
> Div. 1984), where the eyewitness did not have an
> opportunity to see the perpetrator well.  In *Frey*, we
> determined that, although the judge instructed the jury
> that the State had the burden of proving that the defendant
> was the assailant, and defense counsel failed to object to

the charge, the omission of a complete and specific
identification charge was reversible error.  *Id.* at 329-30.

As part of an identification charge, the trial judge must
inform the jury that the State's case relies on an
eyewitness identification of the defendant as the
perpetrator.  The jury must also be informed that in
weighing the reliability of that identification, the "jury
should consider, among other things, 'the capacity or the
ability of the witness to make observations or perceptions
... at the time and under all of the attendant
circumstances for seeing that which he says he saw or that
which he says he perceived with regard to his
identification.'"  *State v. Cromedy*, 158 N.J. 112, 128
(1999)(citing *State v. Green, supra,* 86 N.J. at 293-94).

Here, although the evidence of defendant's identity as a
perpetrator was circumstantial, the evidence as a whole
created strong inferences.  Defendant was seen dressed
entirely in black on the day of the killings and he took
Leervin Hill's mask.  Thereafter, defendant met with a
group of people, including Latisha and Lakesha, and told
them that he was looking for K.C. and was going to kill
him.  When Malik entered Nate's apartment just prior to the
killings, and questioned K.C. and others about the attack
upon Gary the preceding evening, K.C. disavowed any
involvement.  Malik replied that they were going to speak
to Gary's older brother.  Almost immediately thereafter,
the masked man, who fit the body type of defendant and was
dressed in black with dark green pants, entered the
apartment and asked K.C. why he had jumped his brother.
After the shootings, K.C., while lying on the ground and
wounded, told the neighbor that "Dennis" had shot him.  In
his unrecorded statement to the prosecutor and the police,
defendant admitted that he, Malik, and Fahim went to Nate's
apartment looking for K.C., and admitted that he had been
dressed in black clothes and a ski mask.  In total, the
physical description, the clothes, the ski mask,[6] and the
defendant's oral statements, including his asking K.C. why
he had jumped his brother, clearly implicated defendant.
Moreover, identification of defendant did not rest solely

---

[6] The ski mask in question was not described by defendant in his
statement to police.  The mask taken from Hall was described as
a foam half-mask, which may be considered a ski mask.

on a single eyewitness, unlike that in *Green, supra*, 86
N.J. at 297.

The judge instructed the jury that the State must prove all
elements of the crimes beyond a reasonable doubt, and that
the defendant was not obligated to prove anything.  The
judge instructed the jury that in order to find defendant
guilty of murder, they must find, beyond a reasonable
doubt, that defendant caused the deaths of K.C. and Malik,
and did so purposely or knowingly.

Defendant argues that because the identification charge was
not given to the jury, "there is no way to dispel the
possibility that the jury, although not convinced beyond a
reasonable doubt that [defendant] was at the scene,
nonetheless convicted him because it erroneously believed
that he had the obligation to prove that the perpetrator
had been someone else."  However, defendant's
identification, although obviously an important aspect of
the case, was not an essential, contested issue.  The State
did not rely exclusively upon a single eyewitness to
provide evidence of the perpetrator's identity.  Nor did
the defendant rely on misidentification in his defense.
Given the strength and sources of circumstantial evidence,
the issue of identification was not a key issue.  Thus, a
jury instruction specifically on identification was
unwarranted.  Although it may be better practice for a
trial judge to give an identification charge in every case
where identification is even a remote issue, it is
abundantly clear that the failure to do so in this case did
not constitute plain error, and if there was error, it
clearly was harmless under the factual circumstances of
this case.

(Ra7, December 16, 1999 Appellate Division Opinion at pp. 14-

17.)

     Generally, a jury instruction that is inconsistent with

state law does not merit federal habeas relief.  Where a federal

habeas petitioner challenges jury instructions given in a state

criminal proceeding, the only question for the court to consider

is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S. 62, 72-73 (1991).  It is well established that the instruction "may not be judged in artificial isolation," but must be viewed in the context of the instructions as a whole and the trial record.  Further, in reviewing an ambiguous instruction, the court should inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.  *Estelle*, *supra* (citations omitted); *see also Smith v. Spisak*, 558 U.S. 139, 130 S.Ct. 676, 684 (2010)(no right to habeas relief if Supreme Court has not previously held jury instruction unconstitutional for same reason); *Waddington v. Sauausad*, 555 U.S. 179 (2009).

The United States Court of Appeals for the Third Circuit has observed that a habeas petitioner who challenges state jury instructions must "point to a federal requirement that jury instructions ... must include particular provisions," or demonstrate that the jury "instructions deprived him of a defense which federal law provided to him."  *Johnson v. Rosemeyer*, 117 F.3d 104, 110 (3d Cir. 1997).  This is because district courts do not "sit as super state supreme courts for the purpose of determining whether jury instructions were

correct under state law with respect to the elements of an offense and defenses to it." *Id.*

However, a jury instruction that "reduce[s] the level of proof necessary for the Government to carry its burden [of proof beyond a reasonable doubt] is plainly inconsistent with the constitutionally rooted presumption of innocence." *Cool v. United States*, 409 U.S. 100, 104 (1972). *See also In re Winship*, 397 U.S. 358, 364 (1970)("the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged"); *Sandstrom v. Montana*, 442 U.S. 510, 523 (1979)(jury instructions that suggest a jury may convict without proving each element of a crime beyond a reasonable doubt violate the constitutional rights of the accused); *Smith v. Horn*, 120 F.3d 400, 416 (1997), *cert. denied*, 522 U.S. 1109 (1998)(the Due Process Clause is violated only where "the erroneous instructions have operated to lift the burden of proof on an essential element of an offense as defined by state law.").

"[T]rial courts must avoid defining reasonable doubt so as to lead the jury to convict on a lesser showing than due process requires." *Victor v. Nebraska*, 511 U.S. 1, 22 (1994). As the Supreme Court explained in *Victor*, so long as the court

35

instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof.  Rather, taken as a whole, the instructions must correctly convey the concept of reasonable doubt to the jury.  *Victor*, 511 U.S. at 6 (citations and internal quotation marks omitted).  "[A] misdescription of the burden of proof ... vitiates *all* the jury's findings." *Sullivan v. Louisiana*, 508 U.S. 275, 281 (1993)(emphasis in original).  Such an error is considered structural and thus is not subject to harmless error review.  *See id*. at 280-82.  *But see Neder v. United States*, 527 U.S. 1, 8-11 (1999)(applying harmless-error analysis where jury was not instructed on an element of an offense).

Additionally, "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law."  *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977). Specifically, in this case, the Appellate Division determined that the trial court's failure to give the jury a specific instruction on identification was not error because the issue of identification was not an essential, contested issue.  The state courts emphasized that due to the strong and substantial circumstantial evidence, the issue of identification was not a

36

key issue.  Further, the failure to give specific instructions on identification did nothing "to lift the burden of proof on an essential element of an offense."  Accordingly, this Court finds that Petitioner was not deprived of a fair trial by an omitted identification charge, and any error as asserted by Petitioner regarding the omission of an identification instruction was, at the very most, plainly harmless in light of the overall record. There was no error of constitutional dimension, and the state court ruling on this issue is neither contrary to nor an unreasonable application of the applicable federal law, nor is the decision based upon an unreasonable determination of the facts.  Therefore, Petitioner is not entitled to relief on this claim.

   2.  *Failure to Instruct on Lesser Included Offense*

   In Point Four of his petition, Petitioner contends that the trial court erred in not giving a jury charge on the lesser included offense of passion/provocation manslaughter. Petitioner contends there was ample evidence to support a jury charge on the lesser included offense because Petitioner had learned of his younger brother's assault a few hours before the victims were shot, and that there was testimony that showed Petitioner was enraged upon learning of the assault on his younger brother.  (Petition, Point Four, Supporting Facts.)

37

Petitioner raised this claim on direct appeal.  The Appellate Division noted that the offense of passion/provocation manslaughter is not demonstrated unless the following four elements are met:  (1) the provocation must be adequate; (2) the defendant must not have had time to cool off between the provocation and the killing; (3) the provocation must have actually impassioned the defendant; and (4) the defendant must not have actually cooled off before the killing.  (Ra7, December 16, 1999 Appellate Division Opinion at pg. 9, citing *State v. Mauricio*, 117 N.J. 402, 411 (1990)).

The Appellate Division observed the basis for Petitioner's claim of provocation was the attack on Petitioner's younger brother.  However, the court also noted the trial evidence, which showed that "[d]efendant was not present during the attack; he merely heard about the attack the next day," and that "upon learning of the attack of his younger brother, defendant telephoned his mother, who confirmed the prior evening attack but also assured defendant that his younger brother Gary was not injured."  (Ra7, pp. 10-11.)

The Appellate Division further held that the evidence at trial was insufficient to support a passion/provocation manslaughter charge, observing:

Here, defendant's younger brother was beaten by K.C.  If
defendant were present at that fight, his passion would
undoubtedly have been inflamed.  Learning about the attack
the next day probably impassioned defendant just as if he
were present to witness the attack.  However, defendant
learned that his brother was uninjured.  Thus, objectively,
defendant's response to the provoking incident was
unreasonable.  Defendant's younger brother and K.C. engaged
in a fist fight; if defendant had been present at the fist
fight, armed with a handgun, and joined the fist fight with
a gun, it would not be characterized as mutual combat.
[citation omitted].  As such, defendant's actions the
following day are no more justifiable under the mutual
combat rule.  It is clear that defendant took unfair
advantage of K.C. and killed him not out of passion or
provocation, but in retaliation.

Defendant notes that K.C. may have been armed at the time
of the killings; however, the combat that would constitute
the provoking incident was the fist fight between K.C. and
defendant's brother the prior evening, not the incident
that immediately preceded the killings.  The provocation in
this case was insufficient to cause a reasonable person to
lose self-control so as to reduce the murder to
manslaughter.  [citation omitted]

The second element of passion-provocation manslaughter is
that the time between the provoking incident and the
killing was an insufficient period for a reasonable person
to cool off.  Defendant found out about the attack on his
brother "at some point the following day or evening."  It
is clear from the record that defendant was aware of the
attack at around 6:00 p.m.  The shooting took place at
about 8:30 p.m.  While a reasonable person would be enraged
upon discovering that his or her little brother had been
violently attacked, objectively, it was not error for the
trial judge to conclude that defendant's passion would
abate in two-and-a-half hours, particularly when defendant
was specifically informed that his brother, though
attacked, was not injured.  Stated otherwise, the emotions
that might linger several hours after the discovery of such
news would be insufficient to cause a reasonable person to
lose "mastery of his [or her] understanding ... ."
[citation omitted].  Because a reasonable person would cool
off in two-and-a-half hours after discovering that their

> brother had been attacked, the facts of this case do not
> satisfy the second element of passion-provocation
> manslaughter.  Thus, the trial judge did not err in
> refusing to give the charge.

(Ra7, December 16, 1999 Appellate Division Opinion at pp. 12-
13.)

As discussed above, questions regarding jury instructions
are typically matters of state law not cognizable in a federal
habeas action, unless the instruction (or omitted instruction as
asserted here) was so prejudicial as to amount to a violation of
due process and fundamental fairness.  *See Estelle*, 502 U.S. at
72-73.  The Supreme Court has held that due process requires
that a jury instruction on a lesser included offense be given
only when the evidence warrants such an instruction.  *See Hooper
v. Evans*, 456 U.S. 605, 611 (1982).  Moreover, on habeas review,
a trial court's finding as to whether the evidence at trial
warranted an instruction is a finding of fact entitled to the
§ 2254(d) presumption of correctness.  *Miller v. Fenton,* 474
U.S. 104, 112 (1985).

Here, the state courts found that the evidence did not
support an instruction on passion/provocation manslaughter.
This Court agrees and finds that Petitioner was not deprived of
a fair trial by the omission of a jury charge on
passion/provocation manslaughter.  There was substantial

40

evidence at trial, as discussed above, to negate the second, requisite element of passion/provocation manslaughter. Consequently, there was no rational basis for the jury to convict on a passion/provocation manslaughter charge as suggested by Petitioner.  The state courts' decisions in this regard were neither contrary to nor an unreasonable application of Supreme Court precedent.  Accordingly, Petitioner is not entitled to relief on this claim.

D.  <u>Trial Counsel's Conflict of Interest</u>

Next, Petitioner asserts that he was deprived of a fair trial by the trial court's refusal to grant Petitioner's request for an adjournment and removal of trial counsel based on an alleged conflict of interest.  Petitioner alleges that, before trial, it was discovered that defense counsel was "close personal friends with one of the State's primary witnesses, Sgt. Joseph Forte, the Chief Investigator of the case," who had participated in the interrogation of Petitioner.  Petitioner expressed his concern to counsel that counsel could not effectively cross-examine Forte during trial.  Petitioner also related this concern to the Office of the Public Defender, and asked for new counsel to be assigned.  The request was denied. Petitioner then notified the trial court of his concern about a conflict of interest, and asked that the trial be adjourned.

41

This request also was denied.  (Petition, Point Five, Supporting Facts.)

Petitioner raised this issue on direct appeal.  The Appellate Division rejected Petitioner's claim, finding that:

> Defendant does not allege that counsel had previously
> represented Sergeant Forte, or that they were in business
> together.  According to the Rules of Professional Conduct,
> an attorney cannot represent a client if the attorney is
> limited by his or her responsibilities to a third person or
> limited by the attorney's own interests.  [New Jersey Rules
> of Professional Conduct (*R.P.C.*)] 1.7.  However, friendship
> alone, without more, should not preclude effective
> representation.  Trial counsel's close friendship with
> Sergeant Forte was not alleged to be so strong as to
> outweigh counsel's obligation to vigorously represent
> defendant.  We thus conclude that the trial judge did not
> abuse her discretion in permitting defendant's counsel to
> represent defendant at trial.

(Ra7, December 16, 1999 Appellate Division Opinion at PP. 23-24.)

Here, Petitioner fails show that the trial judge abused her discretion in allowing defense counsel to continue representation of Petitioner at trial.  As the Appellate Division observed, there was no evidence or suggestion that counsel's friendship with Sgt. Forte would have interfered with his vigorous and partisan representation of Petitioner.  Rather, it was only Petitioner's speculation that counsel's representation of Petitioner would be undermined by counsel's friendship with Sgt. Forte.  Thus, Petitioner has failed to

demonstrate by "clear and convincing evidence," that the state court's determination of the facts, which are presumed correct, was unreasonable in light of the record.  Because this Court finds no merit to Petitioner's claim for habeas relief, it will be denied accordingly.

E.   <u>Prior Incident Regarding Petitioner's Possession of a Gun</u>

In Point Six of his petition, Petitioner asserts that the State had elicited testimony from the witness Lakesha in which she stated that a few days before the murders, she had seen Petitioner with a gun.  Although defense counsel strenuously objected to the testimony, the trial court overruled the objection.  When Lakesha's trial testimony resumed, she stated that it was a few weeks before the murders that she had seen Petitioner with a gun.  Again, the defense objected and the trial court overruled the objection.  Then, outside the presence of the jury, the trial court questioned Lakesha where she again changed her statement and stated that the night she saw Petitioner with a gun, he had it with him the whole night. Petitioner alleges that the trial judge allowed the State to present "other-crimes-evidence concerning the petitioner being in possession of a gun on a prior occasion," which effectively deprived him of a fair trial.  (Petition, Point Six, Supporting Facts.)

Petitioner also raised this claim on direct appeal.  On appeal, Petitioner argued that when he initially was questioned by the police, he admitted that he and his friends drove to Nate's apartment on the night of the murders looking to fight K.C., but he did not bring a gun with him, and he was surprised

44

that Fahim had a gun.  However, this exculpatory statement to
the police "was undermined by the allegedly improper admission
of other-crimes testimony, [New Jersey Rules of Evidence
(*N.J.R.E.*)] 404(b), that he had been in possession of a gun on a
prior occasion."  (Ra7, December 16, 1999 Appellate Division
Opinion at pg. 17.)  In examining Petitioner's claim, the
Appellate Division discussed *N.J.R.E.* 404(b) and *State v.
Cofield*, 127 N.J. 328, 338 (1992), which set forth a four-prong
test for admissibility of other-crimes evidence.[7]  The Appellate
Division rejected Petitioner's claim as follows:

> Defendant argues that the State failed to satisfy the first
> prong of the *Cofield* test because the evidence of
> defendant's prior possession of a gun was not probative
> with regard to any material issue in the case.  At trial,
> the State argued that the evidence of prior gun possession
> was relevant to defendant's ability to possess a firearm
> and relevant to whether he was armed on the day of the
> killings.  When the State first elicited the testimony that
> Lakesha had seen defendant with a gun a few days prior to
> the killings, defendant objected.  The trial judge
> overruled the objection.  However, after Lakesha resumed
> testifying, she stated that she had seen defendant a few
> weeks prior to the killings.  Defendant renewed his
> objection.  The judge at first sustained defendant's
> objection because the prior possession had been two weeks
> before the killings.  However, after recess, the judge
> spoke with Lakesha outside the jury's presence and learned

---

[7] The four factors include:  "(1) the evidence of the other crime
must be admissible as relevant to a material issue; (2) it must
be similar in kind and reasonably close in time to the offense
charged; (3) the evidence of the other crime must be clear and
convincing; and (4) the probative value of the evidence must not
be outweighed by its apparent prejudice."  *Cofield*, 127 N.J. at
338.

that, on the night that Lakesha saw defendant with the gun,
he had it in his possession for the entire evening while he
played cards with his friends.  Thus, the judge reversed
her ruling and permitted the evidence, finding that the
evidence tended to make it more likely that defendant
possessed a gun on the night of the killings.  Thus, the
judge allowed the testimony; however, she gave the jury a
limiting instruction.  She informed the jury to consider
defendant's possession of the gun two weeks prior to the
killings as relevant only to whether defendant had access
to a gun.

The next day Latisha testified and corroborated Lakesha's
testimony that defendant had, on a prior occasion,
possessed a gun.  Defendant again objected on the grounds
that such evidence was other-crimes evidence.  The trial
judge held that under the *Cofield* test, the testimony was
permissible.  During jury instructions, the judge informed
the jury that the evidence of prior possession elicited
from both Lakesha and Latisha could only be considered for
the limited purpose of establishing defendant's access to a
gun.  The State admits that possessing a gun is not a crime
or wrong under *Rule* 404(b).  Yet the evidence satisfies the
*Cofield* test, particularly in light of the specific
limiting instruction given to the jury.  Lastly, the State
notes that even if the judge erred in permitting the
testimony, the error was harmless because of the
overwhelming evidence of guilt, the negligible weight of
such evidence, the limiting instructions, and the
likelihood that the jury failed to accept the witnesses'
testimony as credible.  We agree.  Even if the judge
improperly admitted the evidence, the error was harmless.
The strength of the circumstantial evidence indicating that
defendant possessed a gun at Nate's apartment and shot the
two victims with the gun overcame any prejudice that might
have resulted from testimony that defendant possessed a gun
on a prior occasion.

(Ra7, December 16, 1999 Appellate Division Opinion at pp. 19-

21.)

"[T]he Due Process Clause does not permit the federal

courts to engage in a finely tuned review of the wisdom of state

46

evidentiary rules." *Marshall v. Lonberger*, 459 U.S. 422, 438 n.
6 (1983).  The admissibility of evidence is generally a question
of state law which is not cognizable under habeas review. *See
Estelle v. McGuire*, 502 U.S. 62, 67 (1991); *Keller v. Larkins*,
251 F.3d 408, 416 n. 2 (3d Cir. 2001) ("A federal habeas court,
however, cannot decide whether the evidence in question was
properly allowed under the state law of evidence"); *Hickey v.
Jeffes*, 571 F.2d 762, 766 (3d Cir. 1978) ("As to the contention
that the trial court erred in admitting the victim's testimony
of a prior flirtatious conversation, we find that, if there was
any error in the court's ruling ... that error was at best one
of interpretation of the state's law of evidence and did not
arise to constitutional dimensions").

However, there can be habeas relief for the admission of
prejudicial evidence if the admission was fundamentally unfair
and resulted in a denial of due process. *Estelle v. McGuire*,
502 U.S. at 72.  In cases not governed by the AEDPA, the Third
Circuit has held that the admission of evidence may violate due
process where the evidence "undermine[d] the fundamental
fairness of the entire trial." *Keller v. Larkins*, 251 F.3d 408,
413 (3d Cir. 2001); *see also Lesko v. Owens*, 881 F.2d 44, 51 (3d
Cir. 1989) ("the erroneous admission of evidence that is
relevant, but excessively inflammatory, might rise to the level

47

of a constitutional violation"); *Bisaccia v. Attorney General of State of New Jersey*, 623 F.2d 307, 313 (3d Cir. 1980)(when "the probative value of ... evidence, though relevant, is greatly outweighed by the prejudice to the accused from its admission, then use of such evidence by a state may rise to the posture of fundamental fairness and due process of law").  But § 2254(d)(1) of the AEDPA does not permit this Court to grant habeas relief based on Third Circuit precedent.  *See Parker*, 132 S.Ct. at 2155 ("circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court,' [and] therefore cannot form the basis for habeas relief under AEDPA.").

This Court is not aware of any Supreme Court case clearly establishing that the admission of other crimes or bad acts evidence constitutes a violation of federal constitutional rights, and Supreme Court cases suggest the contrary.  *See, e.g., Estelle v. McGuire*, *supra* (allowing evidence of prior injuries in a trial for infant murder); *Spencer v. Texas*, 385 U.S. 554 (1967)(rejecting due process challenge to admission of evidence of prior similar crimes when judge gives limiting instruction).

"[The Supreme] Court has held on numerous occasions that it is not an unreasonable application of clearly established

48

Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." *Knowles v. Mirzayance*, 556 U.S. 111, 121 (2009) (citation and internal quotation marks omitted). Because the admission of Lakesha's testimony concerning Petitioner's prior possession of a gun, with a careful limiting instruction by the trial court, was not contrary to, or an unreasonable application of clearly established federal law, as determined by the Supreme Court, Petitioner is not entitled to habeas relief under Ground Six. *See Albrecht v. Horn*, 485 F.3d 103, 128 (3d Cir. 2007) ("Where evidence of a defendant's prior bad acts is admitted, a defendant's interests are protected by a limiting instruction, which mitigates the possibility of prejudice"); *Charlton v. Franklin*, 503 F.3d 1112, 1115 (10th Cir. 2007)(state court's admission of evidence of petitioner's prior bad acts did not render trial fundamentally unfair or warrant habeas relief); *Minett v. Hendricks*, 135 Fed. Appx. 547, 553 (3d Cir. 2005)("Minett cites no Supreme Court case clearly establishing the admission of 'other crimes' evidence constitutes a violation of federal fair trial rights").

Therefore, because Petitioner has not shown a deprivation of a constitutional right, an unreasonable application of federal law by the state court, or an unreasonable determination

49

of the facts in light of the evidence presented in the state
court proceeding, as required to grant habeas relief pursuant to
28 U.S.C. § 2254(d), this claim will be denied for lack of
merit.

F.   Sentencing Issue

Finally, Petitioner alleges that he should not have
received a maximum term with a consecutive term as a first time
offender.  He further argues that the trial court failed to give
sufficient weight to the mitigating factors.  Petitioner
presented this claim on direct appeal.  Relying on state law
exclusively, the Appellate Division noted that a reviewing court
may not substitute its judgment for that of the sentencing
court, so long as the sentencing court properly identified and
balanced the relevant aggravating and mitigating factors.
Moreover, the reviewing court may modify a sentence if it shocks
the judicial conscience.  (Ra7, December 16, 1999 Appellate
Division Opinion at pp. 24-25.)  The Appellate Division then
rejected Petitioner's contention that the trial court failed to
give sufficient weight to the mitigating factor that this crime
was Petitioner's first indictable conviction, finding as
follows:

> Here, the sentencing judge gave minimal weight to the
> mitigating factor of defendant's lack of a criminal record.
> She reasoned that, because defendant was only nineteen when

50

he killed K.C. and Malik, he had been an adult for so short
a time that his lack of a criminal record warranted only
minimal weight.

Defendant argues that the judge should have given the
mitigating factor greater weight.  In addition, the
mitigating factor should have counterbalanced the
aggravating factor that defendant would likely commit other
offenses.  However, the trial judge satisfied her duty to
identify and balance the aggravating and mitigating
factors.  Even if she had given greater weight to the
mitigating factor, the three aggravating factors are
sufficient to outweigh the single mitigating factor,
particularly because, as the judge determined, the nature
of the murder of K.C. was exceptionally heinous.  Having
considered the record and the argument of counsel, we
conclude that the findings of fact regarding aggravating
and mitigating factors were based on competent and credible
evidence in the record, that the court did not apply
incorrectly the sentencing guidelines enunciated in the
Code and that, in applying the facts to the law, the court
reached a conclusion that could have reasonably been made
upon a weighing of the relevant factors.  [citations
omitted].  Nor does the sentence shock the judicial
conscience.  [citations omitted].

(Ra7, pp. 25-26.)

As stated above, the violation of a right created by state

law is not cognizable as a basis for federal habeas relief.  *See*

*Estelle*, 502 U.S. at 67-68 ("We have stated many times that

'federal habeas corpus relief does not lie for errors of state

law.'" (quoting *Lewis v. Jeffers*, 497 U.S. 764, 680 (1990)));

*see* 28 U.S.C. § 2254(a)("district court shall entertain an

application for a writ of habeas corpus on behalf of a person in

custody pursuant to the judgment of a State court only on the

ground that he is in custody in violation of the Constitution or

laws or treaties of the United States"). Here, Petitioner
alleges only that the state court failed to properly consider
the mitigating factor that he was a first time offender in
sentencing. As the record shows, the sentencing court did
consider the mitigating factor, but accorded it minimal weight
against the three aggravating factors, one of which the court
gave greater weight because of the heinous nature of the crime.
Accordingly, because Petitioner's allegations with regard to his
sentencing relate only to alleged violations of state law, and
because the sentence does not shock the judicial conscience,
Petitioner is not entitled to federal habeas relief on this
claim.

## V.  CERTIFICATE OF APPEALABILITY

This Court next must determine whether a certificate of
appealability should issue. *See* Third Circuit Local Appellate
Rule 22.2. The Court may issue a certificate of appealability
only if the petitioner "has made a substantial showing of the
denial of a constitutional right." 28 U.S.C. § 2253(c)(2). For
the reasons discussed above, this Court's review of the claims
advanced by Petitioner demonstrates that he has failed to make a
substantial showing of the denial of a constitutional right
necessary for a certificate of appealability to issue. Thus,

this Court declines to issue a certificate of appealability
pursuant to 28 U.S.C. § 2253(c)(2).

## IV.   CONCLUSION

For the above reasons, this Court finds that the § 2254
habeas petition must be denied, and a certificate of
appealability will not issue.   An appropriate Order follows.


__May 24, 2013__          __s/ Jerome B. Simandle__
Date                      JEROME B. SIMANDLE, Chief Judge
                          United State District Court

53